IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-MJ-1070

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| | ) | |
| APOLINAR GARCIA-ANSELMO, | ) | |
| | ) | |
| Defendant. | ) | |

This matter came before the court for detention hearing January 29, 2015, upon the government's request for review of the magistrate judge's release order (DE 35), filed January 22, 2015. For reasons set forth below, defendant is ordered DETAINED.

BACKGROUND

Defendant, charged in complaint filed January 14, 2015, with reentry into the United States of America by a deported alien, in violation of 8 U.S.C. § 1326(a), appeared before the Hon. Robert T. Numbers, II, United States Magistrate Judge, for hearing January 21, 2015, on the government's motion for pretrial detention. The magistrate judge denied the motion, entering an order setting a combination of release conditions, including that the defendant be released to the custody of his wife, Cirila Garcia Pineda ("Garcia Pineda"), and placed on home detention supported by electronic monitoring. This decision subsequently was stayed upon the government's request, pending this court's review.

At hearing January 29, 2015, the court received testimony from Special Agent Thomas D. O'Connell, Resident Agent-In-Charge on behalf of the Department of Homeland Security,

Immigration and Customs Enforcement ("O'Connell"), together with testimony of his supervisee, Thomas R. Halvas, Agent ("Halvas"), an arresting officer in the case. The government also relied upon the declaration of Harold W. Jordan, Special Agent, Drug Enforcement Administration ("Jordan"), received in Case No. 4:12-CV-136, pending before the undersigned, related to the 2012 seizure of $307,970.00, from defendant. Defendant offered the proposed third party custodian, Garcia Pineda, also to supplement her testimony developed January 21, 2015.

The court has benefit of the transcript of that proceeding before the magistrate judge, and the pretrial services report wherein detention is recommended. Error in the probation officer's accounting of defendant's criminal record was corrected at hearing, where the October 21, 1985 arrest was on a misdemeanor offense, illegal reentry and aiding and abetting, and not the felony offense therein reported. Also, O'Connell testified to a 1987 arrest for smuggling seven aliens, for which defendant was convicted, sentenced, and ultimately deported in March 1988, not appearing in the report.

COURT'S DISCUSSION

Pursuant to 18 U.S.C. § 3145(a), if a person is ordered released by a magistrate judge, the attorney for the government may file with the district court a motion for revocation of the order. 18 U.S.C. § 3145(a). The district court should conduct a de novo review of the decision by the magistrate judge. United States v. Clark, 865 F.2d 1433, 1437 (4th Cir. 1989); United States v. Williams, 753 F.2d 329, 333 (4th Cir. 1985); United States v. Ramey, 602 F. Supp. 821, 822-24 (E.D.N.C. 1985). In doing so, the court makes an independent determination as to whether the magistrate judge's findings are correct based on the court's review of the evidence before the magistrate judge. See Williams, 753 F.2d at 333-34. As done in this instance, the court may

2

conduct a further evidentiary hearing if it is necessary or desirable in carrying out the review. See id., at 333; see also United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990) (district court has discretion on whether to conduct a further evidentiary hearing); United States v. Delker, 757 F.2d 1390, 1393-94 (3rd Cir. 1985); United States v. Fortna, 769 F.2d 243, 249-50 (5th Cir. 1985) (same).

Upon thorough review of the government's motion for pretrial detention and the magistrate judge's order of release, the matters of record in this case including transcript of the earlier hearing, and having received additional testimony and heard the arguments of the parties, the court finds the decision to deny the motion for pretrial detention and release defendant was in error. For the reasons set forth below, it is ordered that defendant be detained pending disposition of the case.

In determining whether there are conditions of release, pursuant to § 3142(c), that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, the court must take into account the available information concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including –
>     (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>     (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release . . . .
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). Rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. 18 U.S.C. § 3142(f).

3

In a pretrial detention hearing, the government's burden is to establish by clear and convincing evidence that no conditions of release will reasonably assure the safety of the community. United States v. Salerno, 481 U.S. 739, 751 (1987) (requiring "clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or community" to justify pretrial detention.). To consider whether any conditions of release will reasonably assure a defendant's attendance at trial, the government need only prove that there are no such conditions by a "preponderance of the evidence." United States v. Stewart, 19 F. App'x 46, 47 (4th Cir. 2001) (citing United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985)).

The government contends that defendant poses a significant risk of flight, and that no conditions of release will reasonably assure his attendance at trial. It relies upon the testimony of O'Connell, who familiarized himself with the instant matter by reviewing several "A files"[1] for defendant, as well as documentation in other law enforcement databases, and that he had gathered additional information about defendant through discussions with other agents in his office as well as other law enforcement agencies. O'Connell is a very experienced agent.

Through O'Connell, the government showed that defendant was arrested in November 1983 after attempting to cross the border from Mexico illegally. Defendant gave border patrol officials a false name, "Esteban Alvarado-Solis." Following incarceration, he was deported back to Mexico in January 1984. Less than two years later, in October of 1985, he was arrested again under the name of "Ophelio Perez-Borja," while attempting to transport six other illegal aliens into the United States. Defendant attempted to flee the border patrol prior to his arrest. The record is not clear as to whether defendant was deported following this arrest. However, in June of 1987, he was again

---

[1] Agent O'Connell testified that an "alien file," also known as an "A file" is issued for each legal alien in the United States, as well as illegal aliens processed for deportation or removal.

4

apprehended for illegal entry and for smuggling seven illegal aliens from Mexico, again giving authorities the false name of "Ophelio Perez-Borja."[2] Following incarceration, defendant was deported in March 1988. Based on these three arrests, two "A files" were created for defendant – one associated with the "Alvarado-Solis" alias he used in 1983, and one associated with the "Perez-Borja" aliases he used in 1985 and 1987.

In 2001, defendant's wife, Garcia Pineda, who by that time had become a lawful permanent resident, filed an I-130 Petition for Alien Relative, in order to establish her relationship with defendant. In 2006, she was granted citizenship. Based on that petition, and his wife's change of status, defendant filed an I-485 Application in 2006, requesting an adjustment of his status to that of a lawful permanent resident. On that application, defendant answered "no" to the question of whether he had ever been arrested, cited or charged for any crimes. He also failed to acknowledge he had assisted aliens in trying to enter this country illegally, and denied that he had ever been deported. In a section of the application requesting "A file" numbers, defendant listed only the one number that was associated with his wife's I-130 Petition, omitting the two numbers associated with his arrests in the 1980s.

Defendant's I-485 Application ultimately was denied. The government presented a "Notice of Denial" dated February 19, 2009. This notice also documents that on July 30, 2008, defendant and his wife were interviewed by an officer of United States Citizenship and Immigration Services, where defendant admitted prior deportation, previous illegal entries to the United States, and attempted smuggling of illegal aliens into the United States. O'Connell testified that, during an immigration interview, an examiner will ask the alien questions based on the application, and may

---

[2] The court notes that this 1987 conviction does not appear in the pretrial report prepared by probation.

5

question the applicant about certain responses, having actual knowledge born of extensive pre-interview investigation. Defendant's I-485 Application then was altered upon his admissions at the interview to include affirmative answers to questions regarding his prior arrests, deportations, and smuggling of illegal aliens, with the change "No" to "Yes" documented with defendant's initials handwritten next to each corrected answer.

Defendant's petition was ultimately denied for at least two violations of the Immigration and Nationality Act. An alien who has aided another alien to enter the United States illegally and/or a been deported within ten years of filing a I-485 Application, both of which crimes this defendant has committed, is prohibited admission under law.

O'Connell testified that, after denial of petitioner's I-485 Application, an immigration attorney filed motions to reopen and reconsider. However, the immigration court unfavorably terminated the proceeding and in 2010, defendant again was deported from the United States to Mexico.

O'Connell further testified that in February 2012, defendant was found in possession of approximately $308,000 in United States currency, which was seized. As noted, a civil forfeiture proceeding involving this money currently is pending in this court, under Case No. 4:12-CV-136. The government directly relied in that case upon Jordan's declaration attesting to a stop by Sgt. Matt Miller of the Wayne County Sheriff's Office. United States v. $307,970.00 in U.S. Currency, No. 4:12-CV-136 (E.D.N.C.) (DE 1-1, at 2). Jordan avers that Sgt. Miller discovered the currency in a large black trash bag sitting in a laundry basket in the cargo area of defendant's vehicle, vacuum packed in large increment bundles. (Id., at 2-3). After Sgt. Miller discovered this money, defendant

6

told Sgt. Miller that "he wanted to make a deal" and that Sgt. Miller should "just 'take the money' and spend it." (Id. at 3).

As a result of this incident, O'Connell testified that in October 2014, a representative of the DEA advised his agency to investigate defendant's immigration status. On January 13, 2015, a "knock and talk" was conducted at defendant's address, where defendant was located and arrested for illegal reentry to the United States. Defendant and his wife provided consent to search the residence, which discovered a Mexican voter registration card and a motorcycle driver's license bearing defendant's photo, under the name "Rico Gomes Perez." In addition, agents recovered $59,000 in cash. Agents also recovered Mexican passport pages, apparently related to an agricultural labor business which was previously registered in the name of defendant's wife, but is currently registered under the name of his daughter.

Under cross-examination, O'Connell testified that defendant gave a correct name, date of birth, and Social Security number in his I-485 Application. He also testified that the I-485 Application was prepared by Sherry R. Luna of Charlotte Immigration Services, although he noted that a preparer is obligated to answer the questions based on responses received from the applicant. Further, O'Connell testified that defendant gave agents his correct name, immigration status, and deportation history when he was arrested on January 13, 2015. Agent O'Connell testified that defendant's seven children and his wife are all United States citizens.

In addition, O'Connell testified that the seized documents indicated that defendant and his family members were communicating with an entity called AgWorksH2, which represents itself as an entity that assists in supplying workers with H-2A visas for seasonal agricultural work. However,

7

O'Connell stated that his review of the documents seized did not indicate that any of the workers employed in the family's business have been granted H-2A status.

Agent Halvas's testimony generally corroborated the testimony of O'Connell concerning the consent search and seizure of the Mexican passport, voter registration card and motorcycle license, along with the $59,807 in cash. Agent Halvas also testified that, during the search, defendant's daughter was asked how the family verified the legal status of alien workers in its business, to which she responded that "they don't care."

Agent Halvas also testified to a previous incident involving defendant's daughter, Lucia Cavarrubias.[3] A police report notes that in the early afternoon of Friday, November 21, 2014, three vehicles boxed in Cavarrubias while she was driving. Cavarrubias was assaulted with a stun gun and robbed of one or more bags which she reported to contain a total of $200,000. Cavarrubias told investigating law enforcement agents that she was carrying the money to pay workers.

Garcia Pineda testified that her daughter was carrying money to pay workers on the date that she was robbed. Garcia Pineda testified that the company's accountant writes the company's checks, and that the accountant is also in charge of immigration applications for the company's employees.

As to flight risk, the evidence shows defendant has traveled between the United States and Mexico on numerous occasions evidencing demonstrated fluency in piercing this country's border. He has assisted other illegal aliens in entering the United States. He has regularly relied upon false records and aliases to mislead government officials, and repeatedly averred he would not enter this country illegally only to do so after each deportation. He failed to respond truthfully with respect

---

[3] This information was not available to the magistrate judge.

to his criminal record on his I-485. Only when confronted with the reality of his record did defendant change his answers in furtherance of his bid to adjust his immigration status. There is evidence that he attempted to bribe a law enforcement officer in 2012.

Defendant was in possession of sophisticated documentation, including counterfeit voter registration and motorcycle license records at time of his arrest. In addition to his obvious access to forgery making devices, through his family business, defendant also has access to large sums of money.

In short, defendant has demonstrated knowledge of how to secure himself from detection, successfully applied to promote his movement across the border and within his community, evidenced repeated disregard by his actions and conduct for the law, and not only does this defendant have the know-how to flee but also he has significant means with which to fund his flight. This is more than sufficient to satisfy the preponderance of evidence standard. Stewart, 19 F. App'x at 48.

In addition, the court is convinced no conditions of release can reasonably assure the safety of the community. There was extensive testimony concerning seasonal migrant labor payment practices. The court assumes solely for the purposes of this decision that the money taken from defendant in February 2012 and from defendant's daughter in November 2014 did in fact relate to the family business. Seasonal migrant workers represent an especially vulnerable group of employees. Understandably, those who would seek to work with this pool are subject to regulatory processes which must be scrupulously adhered to.

The evidence in this case shows significant irregularities in the processes by which defendant's family business has operated. Irregularities likely caused his wife to lose her eligibility

9

directly to administer the business which the family then shifted in name to a daughter to avoid mandated cessation of operations. The evidence shows irregularities ongoing in the processes by which the employees are documented , to their detriment and the potential detriment of those farm operations drawing down on this labor assistance. Requisite effort has not been taken to document workers. These deficiencies are part of the pattern of misconduct evinced by this defendant in his disregard for immigration laws.

Moreover, the business in which this defendant is a key employee has taken unjustified risks in the process of providing compensation for its workers, with those risks causing direct financial harm to the workers themselves and physical harm to a family member on at least one occasion. Potentially hundreds and hundreds of laborers were failed to be paid weeks' wages earned as a result of the seizure of funds in 2012, and the robbery occurring last year, involving a total of over $450,000.00. And in that robbery, when a pregnant daughter was entrusted singlehandedly with over $150,000.00 in cash to be delivered by motor vehicle to workers, according to the information of record, she was boxed in on the road by three other vehicles and subject to a terrifying assault and robbery.

Defendant's illegal involvement in the family business runs beyond mere supervision of workers in the fields. The family is nested together in this dubious, at times dangerous, enterprise involving at least two daughters together with defendant and his wife, run in large part out of their place of residence. His return to that place of residence with continued familial and work associations is untenable. The court is convinced for these reasons, too, that defendant's release poses a danger to others  Salerno, 481 U.S. at 751.

CONCLUSION

For these reasons, the court finds by a preponderance of evidence showing that defendant's detention is required to reasonably assure his appearance at trial. Moreover, there is clear and convincing evidence that defendant presents a danger to his community. IT IS ORDERED that defendant be placed in the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the defendant to the United States marshal for the purpose of an appearance in connection with a court proceeding.

SO ORDERED, this 2nd day of February, 2015.

_____
LOUISE W. FLANAGAN
United States District Judge